2005-NMCA-142

125 P.3d 652

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Leonardo GALLEGOS, Defendant–
Appellant.**

No. 24,480.

Court of Appeals of New Mexico.

Oct. 28, 2005.

Certiorari Granted, No. 29,537,
Dec. 12, 2005.

Patricia A. Madrid, Attorney General, Santa Fe, NM, Steven S. Suttle, Assistant Attorney General, Albuquerque, NM, for Appellee.

**676**

John Bigelow, Chief Public Defender, Karl Erich Martell, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

VIGIL, Judge.

{1} Defendant was convicted of one count of criminal sexual contact of a minor in the third degree by a person in a position of authority against Jamie S., and two counts of aggravated indecent exposure against Ursula C. NMSA 1978, § 30–9–13(A) (1990); NMSA 1978, § 30–6–3 (1990). The dispositive issue on appeal is whether Defendant was entitled to a separate trial involving each victim. Concluding that the counts regarding Jamie should have been severed from the counts regarding Ursula, we reverse and remand for two new trials.

## BACKGROUND

{2} Defendant was a juvenile correction officer (guard) at the Youth Diagnostic and Detention Center (YDDC) in Albuquerque, New Mexico, in which minors were incarcerated, and the victims were residents of YDDC under Defendant's control and supervision. Counts 1–7 of the indictment alleged offenses against Jamie. The indictment charged that between September 1, 1998, and January 19, 1999, Defendant engaged in criminal sexual contact of a minor in the third degree by a person in a position of authority by touching Jamie's breasts on three occasions (Counts 1–3), touching her buttocks on three occasions (Counts 4–6), and having her touch his penis on one occasion (Count 7). The remaining counts alleged offenses against Ursula, charging that in a similar time frame, Defendant committed aggravated indecent exposure against Ursula on three occasions (Counts 8–10), and on two occasions asked Ursula to disrobe for him, thereby contributing to the delinquency of a minor (Counts 11–12).

{3} In a separate, earlier-filed indictment, it was alleged that in the same time frame Defendant sexually penetrated M.G., a minor, who was incarcerated at YDDC while under Defendant's control and supervision as a juvenile correctional officer. The State filed a motion to consolidate both indictments

in a single trial. The judge who was presiding over the separate indictment (Judge Allen) denied the State's motion on the basis that the evidence pertaining to each victim would not be cross-admissible in separate trials and unfair prejudice would result in a joint trial involving all three victims. He expressly relied on *State v. Ruiz*, 2001–NMCA–097, 131 N.M. 241, 34 P.3d 630, in his ruling.

{4} In this case, Defendant then filed a motion for separate trials on Counts 1–7 involving Jamie and Counts 8–12 involving Ursula. Defendant alleged that he would be unduly prejudiced in a joint trial, that evidence of the counts involving Jamie would not be admissible in a separate trial on the counts involving Ursula, that evidence as to one victim would allow the jury to unfairly infer criminal disposition as to the other alleged victim, and that the prejudice in a joint trial outweighed any consideration of judicial economy. The motion was denied, notwithstanding Judge Allen's earlier ruling refusing to consolidate both indictments into a single trial. The basis expressed by the trial court was that "it appear[ed] that the central thrust of the evidence would be to show that both are part of a continuing scheme or plan which by its nature was ongoing throughout this period of time that involved both girls and the Defendant's employment." The court also noted that "one of the areas that evidence from both cases could be used in the other [would be] to show there was opportunity." The specific type of opportunity to which the court referred was that Defendant used his position of authority as a guard "to create and further opportunities for access to the girls who were housed at that facility for sexual reasons." In particular, Defendant, by virtue of his position, was able to utilize acts of favor to gain access to the girls, as well as put the girls in a position where the alleged offenses could take place.

{5} Jamie testified that she first met Defendant while she was a resident of YDDC during the fall of 1998. For the first month of their relationship, Jamie and Defendant would talk occasionally but generally behaved like any other resident and any other guard. However, their relationship changed

when they began talking during a dinner held in the facility's chapel. Following that conversation, Defendant attempted to kiss Jamie in the hallway of the chapel. Several days later, Defendant entered the facility's cafeteria while Jamie was cleaning up after dinner. The couple ended up in a nearby restroom where they began kissing. Jamie testified that, while they were in the restroom kissing, Defendant "put his hand on [her] butt and breast." She was not scared and she enjoyed it. Further, Jamie thought Defendant was "extremely handsome" and she "felt lucky" when he showed interest in her. Jamie and Defendant continued to have three to four such encounters per week. During one such encounter, Defendant got Jamie's hand and he put her hand on his penis when they were kissing. On this single occasion, Jamie "got scared and ... pulled away" from Defendant. During cross-examination, Jamie testified that her relationship with Defendant could be properly characterized as girlfriend and boyfriend. In addition to her physical contact with Defendant, Jamie would write him letters and call him at home. Finally, she said that Defendant did not coerce or force her at any time, nor did he threaten her by virtue of his position as a guard if she rebuffed his advances.

{6} Ursula testified that she was also a resident at YDDC in 1998. When she first met Defendant, she would occasionally have casual, friendly conversations with him. However, shortly after they met, Defendant's attitude toward her began to change. When Defendant was alone with Ursula, he was friendly toward her and frequently complimented her. He would also occasionally bring her snacks. However, when other people were around, he would curse at her and call her foul names.

{7} Ursula had difficulty following the rules at YDDC. As a result, the YDDC staff placed her into a special unit known as the Adjustment Unit. The YDDC staff also frequently moved her to an observation room where she could be constantly watched. The observation room was a single small room equipped with a mattress, a toilet, and a sink. It contained a large window of one-way glass that separated the adjacent control unit from the observation room. The glass allowed staff in the control unit to see into the observation room while preventing the resident in the observation room to see into the control unit. From the control unit, YDDC staff controlled the lights in both the control unit and the observation room. While she was in the observation room, Ursula was able to communicate with the staff in the control unit by way of a speaker system.

{8} While it was not generally possible to see from the observation room into the control room, Ursula testified that, if the lights in the observation room and the control unit were turned off, it was possible to see into the control unit from the observation room. Ursula recalled that while she was in the observation room there were a few times when the lights were adjusted such that she could see into the control unit. On these occasions, Defendant was usually in the control unit. The first time that she was able to see into the control room, Ursula "didn't really know what was going on." Defendant was speaking to her and "doing something" but she "didn't know what it was." Thinking about it, she "kind of figured out, like, he was like touching himself and asking [her] if [she] liked it or if it was cool." Ursula testified that on two subsequent occasions, the lights were turned off so that she could see into the control unit and she observed "[Defendant] jacking off in front of [her]." On yet a separate occasion when she was in the observation room, Defendant "told [her] to take [her] shirt off or just flash him." She refused.

{9} In voir dire the prospective jurors were advised by the trial court that Defendant was charged with seven counts of criminal sexual contact of a minor in the third degree by a person in a position of authority, three counts of aggravated indecent exposure, and two counts of contributing to the delinquency of a minor.

{10} After the State rested, Defendant's motion for a directed verdict on Counts 1–6 was granted on grounds that there was an absence of evidence that Defendant used his position to coerce Jamie to submit to criminal sexual contact. The State stipulated to a directed verdict on one count of contributing

to the delinquency of a minor (Count 12), and it was also removed from the jury's consideration. Counts 7–11 of the indictment were then renumbered as Counts 1–5. The jury was never advised that Counts 1–6 and 12 of the indictment were dismissed or given any instructions on how to treat the evidence that was admitted as to these dismissed charges.

{11} The jury was instructed on a single count of criminal sexual contact of a minor by use of coercion by a person in a position of authority as to Jamie and three counts of indecent exposure and one count of contributing to the delinquency of a minor involving Ursula. Defendant did not testify. His attorney relied on inconsistencies in Jamie's and Ursula's testimony and the duty of the State to prove the crimes beyond a reasonable doubt in his closing statement to argue for an acquittal.

{12} The jury found Defendant guilty of criminal sexual contact of a minor in the third degree by a person in a position of authority on the charge involving Jamie. It then found Defendant guilty of two counts of indecent exposure, not guilty of one count of indecent exposure, and not guilty of contributing to the delinquency of a minor on the charges involving Ursula.

{13} Defendant again argued in a motion for a new trial that the trial court erred in denying his motion to sever counts. The motion was denied.

{14} Defendant appeals. Because we hold that the trial court improperly denied Defendant's motion to sever, we reverse and remand.

## STANDARD OF REVIEW

{15} Rule 5–203(C) NMRA provides in pertinent part: "If it appears that a defendant ... is prejudiced by a joinder of offenses ... the court may order separate trials of offenses[.]" Since the resolution of a motion to sever charges "depends in a large measure upon the special circumstances of each case," the trial court has "broad discretion" in ruling on such a motion. *State v. Duffy*, 1998–NMSC–014, ¶ 42, 126 N.M. 132, 967 P.2d 807 (internal quotation marks and citation omitted). Therefore, a ruling on a motion to sever charges is ordinarily re-

viewed by the deferential abuse of discretion standard of review. *Id.* However, it is well settled that a trial court abuses its discretion in denying severance when "prejudicial testimony, inadmissible in a separate trial, is admitted in a joint trial." *Ruiz*, 2001–NMCA–097, ¶ 11, 131 N.M. 241, 34 P.3d 630 (internal quotation marks and citation omitted). This is because prejudice results as a matter of law. However, "[i]f evidence of one offense would be admissible in the trial of the other, a trial court does not abuse its discretion in denying a motion to sever." *State v. Peters*, 1997–NMCA–084, ¶ 12, 123 N.M. 667, 944 P.2d 896. We therefore proceed to determine whether evidence of the offenses involving Jamie would be admissible in a separate trial involving the offenses against Ursula, and vice versa. *See State v. Massengill*, 2003–NMCA–024, ¶ 50, 133 N.M. 263, 62 P.3d 354 (noting we review a trial court decision to admit or exclude evidence under an abuse of discretion standard, unless application of the law to the facts is necessary, which requires de novo review); *State v. Elinski*, 1997–NMCA–117, ¶ 8, 124 N.M. 261, 948 P.2d 1209 (applying de novo review to evidence admitted over objection based on a "misapprehension of the law").

## DISCUSSION

{16} The parties do not dispute that whether evidence of the offenses as to each victim would be cross admissible in a separate trial is governed by Rule 11–404(B) NMRA. This rule of evidence provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

{17} On its face, Rule 11–404(B) prohibits the introduction of certain evidence. When the evidence consists of "other crimes, wrongs or acts" and its admission will "prove the character of a person in order to show action in conformity therewith[,]" the Rule flatly states such evidence is "not admissible." *See State v. Williams*, 117 N.M. 551,

557, 874 P.2d 12, 18 (1994) (stating that "[t]he purpose of Rule 404(B) is to exclude the admission of character traits to prove that a defendant acted in accordance with those traits"). As a result, we have noted that "Rule 11–404(B) is fundamentally a rule of exclusion." *State v. Otto,* 2005–NMCA–047, ¶ 13, 137 N.M. 371, 111 P.3d 229, *cert. granted,* 2005–NMCERT–004, 137 N.M. 455, 112 P.3d 1112; *see also State v. Kerby,* 2005–NMCA–106, ¶ 24, 138 N.M. 232, 118 P.3d 740, *cert. granted,* Sup.Ct. No. 29,336 (August 12, 2005). ("[I]t is essential to recognize that the prohibition against propensity evidence set out in Rule 11–404(A) and in the first sentence of Rule 11–404(B) remains operative even when evidence of other acts is being admitted" for a purpose allowed by Rule 11–404(B)). As such, the rule reflects a well-settled principle of American jurisprudence that a "man should not be judged strenuously by reference to the awesome spectre of his past life." M.C. Slough & J. William Knightly, *Other Vices, Other Crimes,* 41 Iowa L.Rev. 325, 325 (1956). Therefore, in a criminal prosecution " '[t]he State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime.' " 22 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5232, at 343 (1978) (quoting *Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948)). The underlying concern is that if evidence of a defendant's character is improperly presented to the jury it "is likely to be given more probative value than it deserves and may lead the fact-finder to punish a bad person regardless of the evidence of what happened in the specific case." *State v. Lamure,* 115 N.M. 61, 69, 846 P.2d 1070, 1078 (Ct.App.1992) (Hartz, J., specially concurring); *see* Slough & Knightly, *supra,* at 325 (noting that "[e]vidence of other crimes and misdeeds is not excluded because of an inherent lack of probative value, but is withheld as a precaution against inciting prejudice"). Therefore, we must take care to ensure that a defendant is not convicted of an offense "because, generally, he is a bad man, or has committed other crimes" but rather is convicted based solely "on evidence showing he is guilty of [the charged] offense." *State v. Beachum,* 96 N.M. 566, 569, 632 P.2d 1204, 1207 (Ct.App.1981) (internal quotation marks and citation omitted).

{18} This task is particularly critical when sex offenses involving children are charged, as in this case. In *State v. Mason,* 79 N.M. 663, 664, 448 P.2d 175, 176 (Ct.App.1968), the defendant was charged with committing sexual assault upon an eleven-year-old girl and attempted rape of a twelve-year-old girl. Two fifteen-year-old girls testified over objection about sexual relations they had with the defendant, and he was convicted of the offenses involving the eleven- and twelve-year-old girls. *Id.* at 664–65, 448 P.2d at 176–77. The convictions were reversed because the evidence involving the fifteen-year-old girls was improperly admitted as character and disposition evidence and it was unduly prejudicial. *Id.* at 668, 448 P.2d at 180. This Court first observed that, "[o]rdinarily proof of a distinct offense independent of the offense with which the accused is charged and for which he is being tried is not admissible." *Id.* at 665, 448 P.2d at 177. It is particularly pertinent to this case that the court then said:

> Because of the emotional persuasiveness of evidence involving sex offenses with or upon children, the evidence of similar but distinct offenses with or upon other children should ordinarily be excluded. The danger or prejudice so often outweighs the permissible probative value of such evidence. This does not mean such evidence may not properly be received if it is relevant to, and its probative force is sufficiently great upon, some material element of the crime charged which is in issue and upon which there is doubt, such as identity, intent, knowledge, etc.

*Id.* at 667, 448 P.2d at 179.

{19} This admonition as it relates to sex offenses involving children has been repeated and applied several times. *See Ruiz,* 2001–NMCA–097, ¶ 14, 131 N.M. 241, 34 P.3d 630 (stating that "prior-bad-acts evidence is especially damaging when the case involves a particularly reprehensible crime against a child") (internal quotation marks and citation

omitted); *State v. Montoya*, 116 N.M. 72, 75, 860 P.2d 202, 205 (Ct.App.1993) ("Evidence that a defendant committed a prior illegal sex act against a child is extremely prejudicial."); *State v. Aguayo*, 114 N.M. 124, 131, 835 P.2d 840, 847 (Ct.App.1992) (stating that evidence of uncharged conduct "can be incendiary in child abuse cases" and that "in these volatile cases the courts must be especially careful in applying the rules of evidence"); *State v. Lucero*, 114 N.M. 489, 494, 840 P.2d 1255, 1260 (Ct.App.1992) (" 'Prior bad acts evidence is so powerful that it is outcome-determinative in most cases of sexual contact with a child.' " (quoting Chris Hutton, *Commentary: Prior Bad Acts Evidence in Cases of Sexual Contact with a Child*, 34 S.D. L.Rev. 604, 625–26 (1989))).

{20} To determine whether "the evidence would have been cross-admissible in separate trials with respect to each [victim]" under Rule 11–404(B), we use a two-step process. *Ruiz*, 2001–NMCA–097, ¶ 15, 131 N.M. 241, 34 P.3d 630. Our first inquiry is whether the evidence is being offered for a purpose that "satisfies a valid exception to the general prohibition on propensity evidence." *Id.* If the evidence satisfies this requirement, our second inquiry is under Rule 11–403 NMRA in which we "balance the prejudicial effect of the evidence against its probative value to determine if '[the] probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury.' " *Ruiz*, 2001–NMCA–097, ¶ 15, 131 N.M. 241, 34 P.3d 630 (quoting Rule 11–403) (alteration in original).

{21} Defendant argues that under this formula, evidence of the charges relating to Jamie would not be admissible in a separate trial on the charges relating to Ursula, and vice-versa. The State counters that the evidence would be cross-admissible to show Defendant's common scheme or plan.

## A. Evidence of Defendant's Prior Bad Acts to Show Scheme or Plan

{22} Rule 11–404(B) permits evidence of "other crimes, wrongs or acts" to be admitted to prove a "plan." The authorities recognize a "plan" under this exception in two separate, distinct ways. *See generally* George L. Blum, Annotation, *Admissibility, In Rape Case, of Evidence That Accused Raped or Attempted to Rape Person Other Than Prosecutrix—Prior Offenses*, 86 A.L.R.5th 59, 81–82 (2001) (noting that "common plan or scheme" exception is used in two ways: where the common scheme or plan embraces the commission of two or more crimes; and when there are sufficient similarities between the charged crime and other offense); George L. Blum, Annotation, *Admissibility, In Rape Case, of Evidence That Accused Raped, or Attempted to Rape, Person Other Than Prosecutrix—Offenses Unspecified As to Time*, 88 A.L.R.5th 429, 440 (2001) (same); Timothy E. Travers, Annotation, *Admissibility, In Rape Case, of Evidence That Accused Raped or Attempted to Rape Person Other Than Prosecutrix*, 2 A.L.R.4th 330, 338 (1980) (same); Russell J. Davis, Annotation, *Admissibility, Under Rule 404(b) of the Federal Rules of Evidence, of Evidence of Other Crimes, Wrongs, or Acts Similar to Offense Charged to Show Preparation or Plan*, 47 A.L.R. Fed. 781, 784 (1980) (same).

{23} First, where other crimes are committed to accomplish a larger "plan" (the crime charged), evidence of the other crimes is admissible under Rule 11–404(B) to prove the crime charged. An example is stealing a car that is later used in a bank robbery. *See State v. Griffin*, 116 N.M. 689, 691–92, 866 P.2d 1156, 1158–59 (1993) (noting that robber drove away in a car that matched description of a recently stolen car in four bank robberies); *State v. DeVincentis*, 150 Wash.2d 11, 74 P.3d 119, 124 (2003) (en banc) (citing as an example, "a prior theft of a tool or weapon, which is used to perpetrate the subsequent charged crime, such as a burglary"). Such evidence " 'involves no inference as to the defendant's character; instead his conduct is said to be caused by his conscious commitment to a course of conduct of which the charged crime is only a part.' " *Lamure*, 115 N.M. at 70, 846 P.2d at 1079 (Hartz, J., specially concurring) (quoting Wright & Graham, *supra*, § 5244, at 499–500).

{24} Evidence concerning the offenses against Jamie would not be admissi-

ble as such a "plan" in a separate trial concerning the offenses against Ursula under *Montoya*. The defendant in *Montoya* was convicted of two counts of criminal sexual penetration for molesting a girl while she was sleeping in his daughter's bed. 116 N.M. at 73, 860 P.2d at 203. At trial, the State introduced evidence that seven years earlier the defendant had molested a nine-year-old girl who was sleeping in his daughter's bed. *Id.* On appeal, this Court held that for evidence of the defendant's prior bad act to be admissible as evidence of the defendant's plan "[t]here must be some overall scheme of which each of the crimes is but a part"; it was not enough simply to show that the defendant "took advantage of similar situations in a similar manner." *Id.* at 74, 860 P.2d at 204. Further, in the absence of such an overall scheme "[t]o say that the defendant had a 'plan' to seduce every [girl who slept over at his house] he could may not do violence to the language but it does undermine the policy of Rule 404(b) by permitting the use of propensity to prove conduct." *Id.* at 74, 860 P.2d at 204 (second alteration in original) (internal quotation marks and citation omitted). As a result, we reversed the trial court's admission of the evidence of the prior bad act because "without some other proof that such a plan actually existed, evidence that the charged conduct is part of a bigger plan because Defendant did the same thing once before is nothing more than irrelevant propensity evidence." *Id.; see also State v. Velarde*, 67 N.M. 224, 227, 354 P.2d 522, 524 (1960) (holding it was reversible error to allow cross examination about the defendants' sexual assault of a Navajo woman in a prosecution for rape of an Apache woman one month later because, "[i]t was wholly irrelevant and could serve no purpose other than to show a disposition on the part of the [defendants] to commit the crime with which they were charged").

{25} Second, other jurisdictions have held that evidence is also admissible to show a "plan" under Rule 11–404(B) where the same "plan" is used repeatedly to commit separate crimes that are markedly similar to the way in which the crime charged was committed. *See DeVincentis*, 74 P.3d at 124–26 (discussing this type of "plan" in detail). In order to

constitute an admissible "plan" under this exception, the similarities between the charged bad act and the charged offense must be substantial. *See Matthews v. Super. Ct.*, 201 Cal.App.3d 385, 247 Cal.Rptr. 226, 231–32 (1988) (affirming the admission of evidence of prior sexual assaults because "the three instances were strikingly similar and consequently did tend to show defendant had a common plan for picking up and raping young women at a certain place and in a certain way"); *State v. Kackley*, 32 Kan. App.2d 927, 92 P.3d 1128, 1133 (2004) (noting that "[a] number of decisions have upheld the admission of [evidence of prior bad acts] in sex crime cases where the details of the plan for the prior crimes and the crime for which the defendant was on trial were 'strikingly similar' "); *State v. Frazier*, 344 N.C. 611, 476 S.E.2d 297, 300 (1996) (affirming the admission of evidence of prior sexual misconduct to show the defendant's plan or scheme in part because the evidence "tended to prove that defendant's prior acts of sexual abuse occurred ... in a strikingly similar pattern"). Our own cases, however, do not appear to utilize such a broad reading of "plan" under Rule 11–404(B). *Compare Griffin*, 116 N.M. at 691–92, 866 P.2d at 1158–59 (describing a strikingly similar, signature-type of method of committing bank robberies, involving the robber's wearing an all-black costume, utilizing ear phones and devices attached to a belt, using a gym bag for carrying the proceeds, and jumping athletically onto and over counters), *with Montoya*, 116 N.M. at 73–74, 860 P.2d at 203–04 (described above, the court holding the evidence inadmissible), *and State v. Jones*, 120 N.M. 185, 186, 189, 899 P.2d 1139, 1140, 1143 (Ct.App.1995) (involving the very similar behavior of the defendant accosting two victims while they waited in drive-up lines late at night and getting into their cars, going to another location, forcing himself upon them, and releasing them the next morning, the court holding the evidence inadmissible).

{26} With respect to the allegations against Defendant, we conclude that evidence of the crimes would not be cross-admissible to show such a plan. Even if we were to broaden the "plan" exception beyond that

which has been adopted in our past cases, with respect to each victim, Defendant's crimes against Jamie and Ursula are not "strikingly similar." Defendant used his position as a guard to cultivate a romantic relationship with Jamie and used his authority within that relationship to force unlawful sexual contact with her. His contact with Jamie frequently occurred in a cafeteria restroom while she was working. The offenses against Ursula were committed in an entirely different manner. Defendant did not use his position as a guard to convince Ursula to do anything. The offenses all occurred while Ursula was confined in the observation room, and none of the offenses involved physical contact with Defendant. Defendant's offenses against Jamie and Ursula do not reflect a plan to repeatedly commit separate offenses in a markedly similar way because they do not reflect a plan to commit the offenses "at a certain place and in a certain way." *Matthews*, 247 Cal.Rptr. at 231–32. To the extent that he used his position as a guard, he used it in a very different way to commit offenses against Jamie than he did to commit offenses against Ursula. In the end, there is simply not "a close degree of similarity or connection between" the offenses against the two victims. *State v. Berry*, 332 S.C. 214, 503 S.E.2d 770, 772 (Ct.App.1998) (internal quotation marks and citation omitted).

{27} Therefore, we conclude that the evidence relating to each of the victims would not be admissible in a separate trial of the other as a "plan" under Rule 11–404(B).

## B. Evidence of Prior Bad Acts to Show Opportunity

■ {28} The State does not argue that the evidence as to each victim was cross-admissible to show Defendant's opportunity to commit the crimes charged. However, the trial court denied Defendant's motion to sever in part because "evidence from both cases could be used in the other to show there was opportunity." *See* Rule 11–404(B) (stating that evidence of other bad acts "may ... be admissible for other purposes, such as proof of ... opportunity")."

{29} The "opportunity" exception to the prohibition on evidence of other bad acts "is something of a mystery." Wright & Graham, *supra*, § 5241, at 484; *see* 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 110, at 626 (2d ed.1994) (noting that "there is little indication of [the] source or intended meaning" of the "opportunity" exception). Further, we are aware of no New Mexico cases that have examined the meaning of the "opportunity" exception. However, federal appellate courts have. *See Lamure*, 115 N.M. at 68, 846 P.2d at 1077 (noting that New Mexico's Rule 11–404 is "virtually identical to Federal Rule[ ] of Evidence 404") (Hartz, J., specially concurring). For example, the First Circuit Court of Appeals has noted that "[t]o show 'opportunity' is to show that the defendant had some special capacity, ability or knowledge that would enable him to commit the crime." *United States v. Maravilla*, 907 F.2d 216, 222 (1st Cir.1990). Similarly, in *United States v. Fairchild*, 526 F.2d 185, 188 (7th Cir.1975), the defendant argued that his conviction for distributing counterfeit Federal Reserve notes should be reversed because the trial court improperly admitted evidence that he had possessed a large number of counterfeit notes. *Id.* The appellate court concluded that the trial court properly admitted the evidence because it was not offered to show the defendant's propensity to commit the crime, but was instead offered because it "tended to prove that [the defendant] had the ability to distribute the notes." *Id.* at 189.

■ {30} The evidence that because Defendant was a guard at YDDC and therefore had access to the inmates and was familiar with the facility unquestionably demonstrated that he had the "capacity, ability or knowledge" to commit the offenses against each victim. We therefore assume, without deciding, that evidence of the offenses against Jamie would be cross-admissible in a separate trial of the offenses involving Ursula pursuant to Rule 11–404(B) (and vice-versa) to prove that Defendant had an "opportunity" to commit the offenses because such evidence would include proof that Defendant was a guard at YDDC. Contrary to the trial court's expressed rationale, there was no specific evidence admitted that De-

fendant used any special knowledge or any-thing else related to his position as a guard to create an opportunity for sexual interaction with the victims. However, even if general opportunity evidence would be cross-admissible under Rule 11–404(B), we must still consider whether its probative value was "substantially outweighed by the danger of unfair prejudice." *Ruiz*, 2001–NMCA–097, ¶ 15, 131 N.M. 241, 34 P.3d 630 (internal quotation marks and citation omitted); Rule 11–403. The probative value of the evidence depends in part on "the availability of other means of proof." *State v. Fuson*, 91 N.M. 366, 368, 574 P.2d 290, 292 (Ct.App.1978). In this case it was uncontested at trial that Defendant was a guard at YDDC with access to the inmates and familiarity with the facility. Further, to the extent that the State needed to show that Defendant had the "capacity, ability or knowledge" necessary to commit offenses against each victim, significant "other means of proof" were readily available. For example, Defendant's former colleagues testified that Defendant worked at YDDC while Ursula and Jamie were residents at the facility. Therefore, the probative value achieved by cross-admitting evidence of the offenses against each victim in a separate trial would be extremely limited. On the other hand, as we have noted above, evidence that a defendant performed an illegal sex act with another minor is especially prejudicial. *See Montoya*, 116 N.M. at 75, 860 P.2d at 205.

{31} The probative value of the cross-over evidence to show "opportunity" was extremely limited, while the resulting prejudice was overwhelming. *See Beachum*, 96 N.M. at 569, 632 P.2d at 1207 (reversing convictions for criminal sexual contact of a minor and aggravated battery where confession to three possible prior acts of rape was admitted over objection to prove identity, there were "other means of proof" of the defendant's identity, and it was not necessary to the state's case on identity to admit the defendant's statement). We therefore hold that evidence of Defendant's offenses against each victim was not cross-admissible to show Defendant's opportunity to commit the charged offenses.

## C. Prejudicial Effect of Joint Trial

{32} A "defendant must prove he was prejudiced" to obtain a severance. *State v. Gallegos*, 109 N.M. 55, 64, 781 P.2d 783, 792 (Ct.App.1989). Since Defendant was found not guilty of two of the five charges submitted to the jury, we proceed to determine whether Defendant was prejudiced. When evidence of prior bad acts evidence is admitted in violation of Rule 11–404(B), "prejudice is established when there are convictions" because "we will not speculate that the erroneous admission of other crimes did not cause a compromise verdict of guilty of some charges and not guilty of others." *Jones*, 120 N.M. at 190, 899 P.2d at 1144. The evidence in this case was not cross-admissible under Rule 11–404(B) to show Defendant's plan. However, since we assumed the evidence was cross-admissible to show "opportunity," which necessitates further analysis of its admissibility under Rule 11–403, our inquiry is not over. We indicated in *Jones* that where evidence is admissible under Rule 11–404(B) but it should have been excluded under Rule 11–403 and the jury acquitted the defendant of some of the charges, we will not assume that the other bad-acts evidence was "so overwhelmingly prejudicial as to completely contaminate the jury." *Jones*, 120 N.M. at 190, 899 P.2d at 1144. Instead, we undertake to determine whether the error in admitting the evidence was harmless. *See Kerby*, 2005–NMCA–106, ¶ 33, 138 N.M. 232, 118 P.3d 740 (undertaking harmless error analysis after holding that evidence of other bad acts evidence concerning the victim was inadmissible).

{33} Where evidence is erroneously admitted in a criminal trial, if "there is a reasonable possibility that the evidence complained of might have contributed to the conviction," it is not harmless. *Clark v. State*, 112 N.M. 485, 487, 816 P.2d 1107, 1109 (1991); *see Kerby*, 2005–NMCA–106, ¶ 33, 138 N.M. 232, 118 P.3d 740; *see also State v. Balderama*, 2004–NMSC–008, ¶ 41, 135 N.M. 329, 88 P.3d 845. The extremely limited probative value of cross-admitting evidence of offenses against each victim to show an "opportunity" to commit the offenses was overwhelmed by its substantial prejudicial

effect. In particular, the strength of the evidence of Defendant's using his position to coerce Jamie was not particularly strong, inasmuch as she testified that he did not use his position at all. Although there were acquittals for two of the offenses involving Ursula, since there was only one offense involving Jamie submitted to the jury and since Defendant was convicted of that offense, we cannot say that the jury did not improperly use the evidence regarding the offenses against Ursula as propensity evidence in its deliberations regarding the offense against Jamie. Regarding Ursula, the acquittals are readily explainable because of inconsistencies in Ursula's own testimony. Without the evidence regarding Jamie, the jury may well have found Ursula's testimony insufficient to warrant any convictions. In short, we cannot say that there is no reasonable possibility that the evidence complained of did not contribute to the convictions. *See Clark,* 112 N.M. at 487, 816 P.2d at 1109.

### D. Sufficiency of the Evidence

■ {34} Defendant also argues that his convictions are not supported by substantial evidence. As discussed above, we reverse the trial court's denial of Defendant's motion to sever. However, "principles of double jeopardy would bar retrial if Defendant's convictions are not supported by substantial evidence." *State v. Barragan,* 2001–NMCA–086, ¶ 22, 131 N.M. 281, 34 P.3d 1157.

{35} To determine whether Defendant's convictions were supported by sufficient evidence, we must consider "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Johnson,* 2004–NMSC–029, ¶ 54, 136 N.M. 348, 98 P.3d 998 (internal quotation marks and citation omitted). This determination requires a two-step inquiry. Our first step is to "view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict." *State v. Graham,* 2005–NMSC–004, ¶ 6, 137 N.M. 197, 109 P.3d 285 (internal quotation marks and citation omitted). Second, we

must "determine[ ] whether the evidence, viewed in this manner, could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted) (emphasis omitted).

{36} To convict Defendant of sexual contact with a minor by a person in a position of authority as alleged, the State was required to show that: (1) Defendant "unlawful[ly] and intentional[ly] caus[ed]" Jamie to touch his "primary genital area"; (2) Jamie was "a child thirteen to eighteen years of age"; and (3) Defendant was "in a position of authority over [Jamie] and use[d] that authority to coerce [her] to submit[.]" Section 30–9–13(B)(2)(a). Defendant argues that his conviction on this charge was not supported by sufficient evidence because the State failed to show that Defendant used his authority to coerce Jamie to touch his penis.

{37} We disagree. Defendant relies on Jamie's testimony that he did not use his position to cause the contact to happen. However, our cases make it clear that appellate courts do not consider the merit of evidence that would lead to a result contrary to the jury's verdict. *See State v. Vigil,* 110 N.M. 254, 256, 794 P.2d 728, 730 (1990). In addition, the State need only prove that the unlawful contact was at least in part a result of Defendant's position of authority. *See State v. Gardner,* 2003–NMCA–107, ¶¶ 33, 38, 134 N.M. 294, 76 P.3d 47.

■ {38} Defendant's convictions for aggravated indecent exposure are also supported by the evidence. Ursula testified that she saw Defendant masturbating on three occasions. However, she acknowledged that on the first occasion she "couldn't make out what he was doing at the time." Based on this testimony, we hold that Ursula's eyewitness testimony is sufficient evidence to support Defendant's conviction on two counts of aggravated indecent exposure.

{39} As discussed above, we hold that the State presented "substantial evidence of either a direct or circumstantial nature ... to support a verdict of guilt beyond a reasonable doubt with respect to every element

essential to" Defendant's convictions on one count of criminal sexual contact with a minor and two counts of aggravated indecent exposure. *Johnson,* 2004–NMSC–029, ¶ 54, 136 N.M. 348, 98 P.3d 998.

### E. Defendant's Other Arguments

{40} Defendant also argues that his convictions should be overturned because: (1) the trial court improperly refused to allow him to present rebuttal witnesses; (2) the prosecutor made inappropriate remarks in her closing argument that amounted to prosecutorial misconduct; and (3) cumulative error deprived him of a fair trial. Because we conclude that the trial court improperly denied Defendant's motion to sever and remand, we need not reach these arguments.

### CONCLUSION

{41} The trial court denied Defendant's motion to sever the counts in the indictment relating to each victim, with the result that the jury heard and was allowed to consider the evidence pertaining to both victims. The evidence relating to each victim would not have been cross-admissible in separate trials to show Defendant's plan to commit the offenses or to show that he had the opportunity to commit them. As a result, the trial court abused its discretion when it denied Defendant's severance motion. Therefore, we reverse Defendant's conviction and remand for two separate trials.

{42} **IT IS SO ORDERED**

WE CONCUR: LYNN PICKARD and JAMES J. WECHSLER, Judges.